# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **SANDRA K. STRAIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:12cv2110 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W.

Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application

of Sandra Strain for supplemental security income (SSI) under Title XVI of the Social

Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the undersigned for a final

disposition pursuant to the written consent of the parties. <u>See</u> 28 U.S.C. § 636(c).

## Procedural History

Ms. Strain (Plaintiff) applied for SSI in April 2009, alleging she was disabled as of

December 1, 1989, by a mental condition. (R.[1] at 240-46, 284.) Her application was denied

initially and following hearings held in May 2010 and December 2010 hearing before

Administrative Law Judge (ALJ) Victor Horton. (<u>Id.</u> at 13-122, 128-32.) Specifically, the

ALJ found that Plaintiff had severe impairments of bipolar affective disorder, borderline

intellectual functioning, and alcohol abuse. (<u>Id.</u> at 113.) With her impairments, including

---

[1]References to "R." are to the administrative record filed by the Commissioner with her
answer.

her substance abuse disorder, she had the residual functional capacity (RFC) to perform a full range of work at all exertional levels with non-exertional limitations of (a) *not* being able to understand, remember, and carry out at least simple instructions and non-detailed tasks; (b) being able to maintain concentration and attention for two-hour segments over an eight-hour period; (c) *not* being able to respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is causal and infrequent; (d) being able to adapt to routine, simple work changes; and (e) *not* being able to perform repetitive work according to procedures, sequence, or pace. (Id. at 114.) With these non-exertional limitations, there were no jobs Plaintiff could perform. (Id.) With her impairments, excluding the substance abuse, Plaintiff would not have the non-exertional limitations described in (a), (c), and (e). (Id. at 116.) Instead, she would be able to do those work-related activities. (Id.) With this RFC, she would be able to perform past relevant work. (Id. at 121.)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision, effectively adopting that decision as the final decision of the Commissioner. (Id. at 1-5.)

In this action, Plaintiff argues that there is little evidence in the record that she has been abusing alcohol or drugs since her amended alleged disability onset date of April 28, 2009.[2] She further argues that the ALJ improperly evaluated the opinions of Drs. Muhammad, Patel, and Espana. The testimony, medical records, and reports submitted pursuant to Plaintiff's application have been summarized in detail in her brief and are set forth below only to the extent necessary for an understanding of, and resolution of, her arguments.

─────────────────────

[2] Plaintiff amended her disability onset date at the beginning of the hearing. (Id. at 16.)

## Background

Plaintiff was forty-six years old at the time of the first hearing. (Id. at 20.) Her attorney affirmed the ALJ's impression she was claiming disability due to mental limitations and not physical limitations. (Id. at 25.)

The ALJ asked Plaintiff about the report of an examiner who evaluated Plaintiff in July 2009 and stated that Plaintiff had told him she had a problem with lying. (Id. at 37.) Plaintiff could not remember the examiner. (Id.) She testified she did not have a problem with lying. (Id.) She also testified that she had trouble with her memory. (Id.)

Plaintiff has used alcohol and drugs. (Id.) She still drinks "a beer every now and then." (Id.) "Probably once a week or something." (Id. at 38.) She has used illegal drugs, including "marijuana, crack, snort coke." She stopped using marijuana in 1996. (Id.) Asked about a statement in the notes of Dr. Armor that Plaintiff "smoked a little marijuana" but did not use other drugs, Plaintiff could not say whether or not she had told him the truth because she had never heard of him. (Id.) She has not used any drugs since 1996. (Id. at 39.) She thought Medicaid needed to know that she had never seen Dr. Armor. (Id. at 40.)

At the conclusion of the hearing, including testimony elicited from a vocational expert, the ALJ informed Plaintiff she was to be send for more medical evaluations and that her history of drug use was to be covered in those evaluations. (Id. at 54.) He further informed her that it was important she answer the evaluators' questions correctly. (Id. at 55.) She noted that the evaluator needed to tell the truth. (Id.) The ALJ agreed. (Id.)

The second hearing began with the testimony of Anne E. Winkler, M.D., Ph.D. Dr. Winkler identified Plaintiff's physical impairments as hypertension and hyperlipidemia, each without any evidence of end organ damage; complaints of back pain, for which there was little in the record to indicate its etiology; complaints of joint pain; and a possible diagnosis of rheumatoid arthritis. (Id. at 68-69.) Based on the records, Dr. Winkler opined that none of Plaintiff's physical impairments met or equaled a Listing. (Id. at 69.) Nor did the impairments result in any physical limitations. (Id. at 70.)

James Reid, Ph.D., a clinical psychologist, was the next witness to testify. He asked Plaintiff when she stopped using cocaine. (Id. at 77.) She replied that it was probably five or ten years earlier – "2003." (Id.) This was also when she stopped using marijuana. (Id.) She stopped drinking "probably six months" earlier. (Id.) She does not buy beer or other alcohol, and if someone brings over a beer, she does not need to drink it. (Id. at 77, 78.) Asked how often she drank beer, Plaintiff replied, "I have a drink – I don't drink." (Id. at 79.) She further explained that she probably stopped drinking beer in September. (Id. at 79, 80.) Dr. Reid opined, based on his review of the records, that Plaintiff is mildly impaired in her activities of daily living, markedly impaired in social functioning, and markedly impaired in concentration, persistence, or pace. (Id. at 88-89.) Continued use of alcohol would reduce her intelligence quotient (IQ) and interfere with her social functioning. (Id. at 89.) Within four to six months of stopping drinking, both areas would improve. (Id. at 89-90.) Asked by Plaintiff's attorney if he saw evidence in the records supporting the idea that Plaintiff was

"heavily using alcohol or heavily using illegal drugs" since April 2009, Dr. Reid replied, "No." (Id. at 90.)

The second hearing was concluded following testimony by Jeffrey Magrowski, Ph.D., a vocational expert. (Id. at 94-104.)

When applying for SSI, Plaintiff completed a Disability Report. (Id. at 283-86.) Asked how her mental condition limited her ability to work, she replied, "I don't know, whatever my doctor says." (Id. at 284.) She completed the eighth grade, and had been in special education classes. (Id. at 288.)

Plaintiff also completed a Function Report, as did a friend who had known her for thirty years. In the Report completed by Plaintiff, she described her daily activities as sitting on the couch, watching television, sleeping, and taking medications. (Id. at 312.) Her activities had not changed because she has always been "a disturb[ed] person." (Id. at 313.) Her impairments adversely affect her abilities to talk, remember, complete tasks, concentrate, understand, get along with others, and, sometimes, follow instructions. (Id. at 317.) She did not answer the question asking how far she can walk before needing to rest. (Id.) Instead, she noted that she was getting irritated with the "stupid" questions. (Id.) Completing the Report was causing her stress. (Id. at 318.)

In the Report completed by a friend, her friend responded that she did not know how Plaintiff spent her day. (Id. at 304.) Her friend reported that Plaintiff could walk one block before having to stop and rest. (Id. at 309.)

On a Disability Report – Appeal form, Plaintiff reported that her impairments have gotten worse since she applied for SSI.  (Id. at 327.)  She has severe depression and a sleeping disorder, for which she takes medication.  (Id.)  Beginning in 2008, she has auditory and visual hallucinations, is suicidal, and gets hot flashes.  (Id.)

The medical records after Plaintiff's amended alleged disability onset date begin with the office notes of Aqeeb Ahmad, M.D., on May 19, 2009,  (Id. at 384.)  Those notes are in a checklist format and indicate that Plaintiff had decreased concentration and energy level.  (Id.)  Her speech was normal; her mood was worried and anxious; her affect was dysphoric; and her form of thought was paranoid, tangential, and circumstantial with poverty of content.  (Id.)  She had no suicidal or homicidal ideations.  (Id.)  She did have hallucinations.  (Id.)  She was, as at the last visit, diagnosed with bipolar disorder.  (Id.)  Her medications included Seroquel, Librium, Artane, and Ambien.  (Id.)

The next month, Plaintiff consulted Faquir Muhammad, M.D., for hot flashes.  (Id. at 521.)

Plaintiff returned to Dr. Ahmad in July, reporting that she was feeling better, but was hungry and gaining weight.  (Id. at 620.)  The Seroquel was discontinued.  (Id.)  On the checklist, it was marked that she had a worried/anxious mood, an anxious affect, and death wishes but no plan or intent.  (Id.)  She was still drinking, and was told to stop.  She was diagnosed with bipolar disorder and alcohol abuse.  (Id.)

In September, Plaintiff informed Dr. Ahmad that she was "[n]ot doing so good."  (Id. at 619.)  She was becoming forgetful and paranoid.  (Id.)  She was drinking six bottles of beer

every three or four days.  (Id.)  She was diagnosed with schizoaffective disorder and alcohol abuse.  (Id.)  She was told to stop drinking.  (Id.)

Plaintiff consulted Parimel Patel, M.D., on October 16 to establish care.  (Id. at 625-27.)  It was reported she did not have a history of alcohol use.  (Id. at 625.)  On the checklist form, it was marked that she had an appropriate affect; depressed and anxious mood; pressured and perseverating speech; intact thought process; and poor memory and concentration.  (Id. at 626-27.)  She was diagnosed with bipolar disorder and was to return in six weeks.  (Id. at 627.)

On October 19, Plaintiff consulted Christopher Espana, M.D., to establish care.  (Id. at 593-96.)  She reported that her past medical history included hyperlipidemia, hypertension, hot flashes, bipolar disorder, and depression.  (Id. at 593.)  Plaintiff drank beer once a week; she did not use drugs.  (Id.)  She complained of joint pain, stiffness, and arthritis.  (Id. at 594.)  On examination, she had a full range of motion in all joints.  (Id. at 595.)  She had a normal mood, affect, concentration, and attention span.  (Id.)  Dr. Espana added prescriptions for Zolpidem, Seroquel, trihexyphenidyl (the generic form of Artane), and Vivelle (a form of estrogen) to her current prescriptions for Lexapro, chlordiazepoxide (a generic form of Librium), and buspirone.  (Id. at 595, 596.)

The next day, Dr. Patel evaluated Plaintiff when she was at DePaul Health Center (DePaul).  (Id. at 534-36.)  She had a history of cocaine abuse and cannabinoid abuse; both had ended three years earlier.  (Id. at 535.)  She denied recent use.  (Id.)  Her mood was depressed; her affect was anxious; her insight and judgment were fair.  (Id.)  She had suicidal

thoughts that morning and was paranoid.  (Id.)  Her diagnosis was bipolar affective disorder, depressed with psychotic features.  (Id.)  She was admitted to the "intensive outpatient program for relapse prevention 3 days a week."  (Id.)  Subsequently, she attended nine group therapy sessions at DePaul.  (Id. at 537-64.)  At one session, she was described as having not used alcohol or drugs for ten years.  (Id. at 559.)  She also had no difficulties with activities of daily living.  (Id. at 561.)

The following day, on October 21, Plaintiff saw Dr. Muhammad for her hot flashes and for a disability exam.  (Id. at 520.)  He noted that there were no complaints of chest pain, shortness of breath, headaches, or low back pain.  (Id.)  She did have some upper back muscle spasms.  (Id.)  She was seeing Dr. Ahmad for bipolar disorder.  (Id.)

Plaintiff returned to Dr. Espana in November for complaints of a cough, cold, and upper respiratory infection.  (Id. at 604-07.)  Her alcohol use was as before.  (Id. at 605.)  On examination, she was anxious, easily distracted, hyperactive, and agitated.  (Id. at 606.)  She had a normal range of motion in all her joints.  (Id.)  Lipitor and Mucinex were added to her prescriptions.  (Id. at 607.)  She was to return in one month.  (Id.)

Dr. Patel noted when seeing Plaintiff on December 18 that she had dropped out of the program at DePaul and was going to return to the Independence Center.  (Id. at 624.)  Her memory, insight, and judgment were assessed as being normal.  (Id.)  Her mood was euthymic; her affect was appropriate.  (Id.)

Plaintiff saw Dr. Patel again on February 19, 2010, and three days later began an "intensive outpatient program" at DePaul, including group and individual therapy and

medication management.  (Id. at 565, 623.)  Initially, she was "very hostile, paranoid, and very cooperative."  (Id. at 565.)  She reluctantly agreed to be seen by Javad Qasim, M.D., but was "very evasive and superficial."  (Id.)  She reported that her problems were "'manic depression and anger.'"  (Id.)  She denied the use of alcohol or drugs.  (Id.)  Dr. Qasim noted that her medical records included a history of cannabis and cocaine use.  (Id.)  At the initial therapy session on February 25, Plaintiff reported no current alcohol use.  (Id. at 583.)  She further reported that she did not want to participate in group therapy, but was doing so because her doctor did not want her to isolate herself.  (Id. at 585, 586.)  In addition to the initial session, Plaintiff attended five group therapy sessions.  (Id. at 568-79.)

Also in February, Plaintiff saw Dr. Espana, complaining that her arthritic pain was worse; the medications were not working.  (Id. at 610-13.)  Her alcohol use was beer once a week.  (Id. at 611.)  She had a decreased range of motion in her hands and fingers due to pain.  (Id. at 612.)  She had a normal mood, affect, attention span, and concentration.  (Id.)  She was to be referred for a rheumatology consultation.  (Id.)

On March 26, Dr. Patel described Plaintiff's mood as "upbeat."  (Id. at 566.)  Plaintiff reported that her sleep, appetite, and energy were "adequate."  (Id.)  Her  mood was "'[g]ood'"; her affect was bright; her thought flow was goal-directed; her insight and judgment were fair.  (Id.)  Her thought content did not include any suicidal or homicidal ideations or psychosis; it was "[m]ildly flighty."  (Id.)  His diagnosis was bipolar disorder, mixed with psychosis by history, and personality disorder, not otherwise specified.  (Id.)  Her current

Global Assessment of Functioning (GAF) was 35.[3]  (<u>Id.</u>)  He noted that Plaintiff "ha[d] a pattern of behavior that is consistent with her feeling better then stopping her medications and decompensating."  (<u>Id.</u>)

Plaintiff again saw Dr. Patel on April 30.  (<u>Id.</u> at 622.)  It was marked on the form that she had good sleep, appearance, and eye contact.  (<u>Id.</u>)  Her speech was coherent; her mood was euthymic; her insight and judgment were impaired.  (<u>Id.</u>)  She did not have any physical complaints.  (<u>Id.</u>)

Plaintiff reported to Dr. Espana on May 3 that her pain was "a little better" after she had seen a Dr. Garriga, been diagnosed with rheumatoid arthritis, and prescribed prednisone.  (<u>Id.</u> at 614-18.)  She needed forms filled out for her disability application.  (<u>Id.</u> at 614.)  She drank beer once a week.  (<u>Id.</u> at 615.)  She denied anxiety and depression.  (<u>Id.</u>)  She complained of joint pain, back pain, stiffness, muscle weakness, gout, and muscle aches.  (<u>Id.</u>)  On examination, she had a full range of motion in her joints.  (<u>Id.</u> at 616.)

Later that month, Plaintiff reported to Dr. Patel that she was having continuing bereavement issues relating to her aunt's death a year earlier.  (<u>Id.</u> at 723-34.)  She also reported feeling paranoid at times and having some residual anxiety.  (<u>Id.</u> at 723.)  She was "[u]pset that '[her] doctor told [her] that [her] brain shrunk because of the cocaine and

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." <u>DSM-IV-TR</u> at 34 (emphasis omitted).

alcohol." (Id.) Her speech was pressured; her mood was depressed; her affect was anxious; her thought flow was goal-directed; her insight and judgment were fair. (Id.) Her diagnosis was and prescriptions were the same as before. (Id.)

On June 6, Plaintiff went to the DePaul emergency room complaints of dizziness and feeling like she was going to faint. (Id. at 740-64.) On arrival, her gait was steady; her speech was clear. (Id. at 740, She had used cocaine and marijuana in the past ten years; she had not drunk alcohol. (Id. at 741.) On examination, she had a normal affect and range of motion. (Id. at 742.) Her discharge diagnoses were dizziness and giddiness; vertigo; and paresthesias. (Id. at 743.) She left against medical advice, explaining that she no longer wanted to wait for a bed. (Id. at 763.)

On June 18, Plaintiff requested of Dr. Espana a magnetic resonance imaging (MRI) of her brain to investigate her complaints of occasional dizziness for the past two years that had become worse during the past month. (Id. at 654-58.) Also, she had reflux symptoms. (Id. at 654.) Her alcohol use was as before. (Id. at 655.) Plaintiff denied experiencing anxiety and depression. (Id.) She was encouraged to stop smoking. (Id. at 658.) The MRI revealed "minimal chronic small vessel ischemic change periventricular white matter bilaterally, of questionable clinical significance," and no acute intracranial abnormality. (Id. at 659-60, 765-66.)

When Dr. Espana saw Plaintiff on July 7, he referred her to an ophthalmologist for her complaints of dizziness. (Id. at 661-65.)

On July 15, Plaintiff had a consultation with a neurologist, Cheryl A. Faber, M.D.  (Id. at 675-78.)  Plaintiff complained of severe pain behind her ears with associated sensitivity to light, blurry vision, nausea, and occasional vomiting; of dizziness; of severe right leg pain; and back that began twenty years ago.  (Id. at 675.)  She had been drug and alcohol free for ten years.  (Id. at 676.)  On examination, her gait favored her right leg; her coordination was normal; her strength was normal, 5/5, in her left lower extremity and was 4 to 4-/5 in her right lower extremity, with some atrophy in her right thigh.  (Id.)  Her memory was fair; her concentration was good.  (Id.)  She was in no apparent distress and was oriented to person, place, time, and situation.  (Id.)  Dr. Faber's impression was of migraine headaches, episodic vertigo, and right leg pain, weakness and numbness.  (Id. at 677.)  Medication was prescribed for the migraines, which, hopefully, would resolve the vertigo.  (Id.)  Plaintiff was to have a nerve conduction study and electromyogram (EMG) of her right lower extremity and an MRI of her lumbar spine to see if her right leg problems originated there.  (Id.)  Also, she was given physical therapy suggestions to help strengthen her leg.  (Id.)  The MRI was normal with the exception of showing mild to moderate bilateral facet hypertrophy at L3-L4.  (Id. at 679.)  The nerve conduction study and EMG revealed that the muscles innervated by the L5 nerve root had increased polyphasia consistent with chronic denervation.  (Id. at 680-82.)  All other muscles and nerves were normal.  (Id. at 681.)

In August, Plaintiff consulted Bruce M. Baskir, M.D., a physician in Dr. Espana's practice, for complaints of pharyngitis.  (Id. at 667-69.)  He noted that she had been started

on gabapentin for chronic migraines.  (Id. at 667.)  He started her on amoxicillin for the pharyngitis.  (Id. at 668.)

Plaintiff was seen by Dr. Faber and Victoria Holman, R.N., F.N.P., in September.  She reported that the previously-prescribed medication was not helping.  (Id. at 671-74.)  On examination, Plaintiff was able to move all her extremities without difficulty with the exception of her right lower extremity.  (Id. at 672.)  She walked with a slight antalgic gait on the right and without an assistive device.  (Id.)  Her medications were adjusted.  (Id.)  She was to return in four weeks or sooner if necessary.  (Id.)

Dr. Patel noted when seeing Plaintiff in October that her mood was euthymic, her affect was appropriate, and her memory was normal.  (Id. at 858.)  She was paranoid.  (Id.)

In November, Plaintiff went to the DePaul emergency room for complaints of nausea and of right lower quadrant pain radiating down her right leg.  (Id. at 821-56.)  The pain had been intermittent for a few months, but had become worse the past two days.  (Id.)  A computed tomography (CT) scan, urinalysis, and lab work were unremarkable.  (Id.)  The physician, Angela Majino, M.D., discussed with Plaintiff the findings and her opinion that outpatient follow-up was appropriate.  (Id. at 821.)  Dr. Majino reported that Plaintiff then became "irate, shouting and using obscenities."  (Id.)  After Plaintiff began cursing, Dr. Majino left the room.  (Id.)  When Plaintiff was being treated, a nurse noted that she was "screaming, cursing, . . . hostile, threatening toward staff."  (Id. at 846.)

Also before the ALJ were evaluations of Plaintiff's mental or physical residual functional capacity or opinions about those capacities.

The earliest of these was the evaluation of Michael T. Armour, Ph.D., referred to by the ALJ at the first administrative hearing. Plaintiff was evaluated by Dr. Armour in July 2009. (<u>Id.</u> at 486-90.) Dr. Armour reported that Plaintiff "stated that she had a problem with lying and did not appear to understand [his] question when he asked if she still told lies if she were not in trouble." (<u>Id.</u> at 487.) Plaintiff reported she first drank alcohol when she was eighteen years old, but had never been intoxicated. (<u>Id.</u>) She had smoked "'a little' marijuana and denied other drug experimentation or use." (<u>Id.</u>) Dr. Armour described Plaintiff as being irritable during the evaluation and, occasionally, "demanding to know why she was being asked so many questions." (<u>Id.</u> at 488, 489.) Her speech was clear, easily understood, loud, and of average rhythm. (<u>Id.</u> at 489.) Her vocabulary was simple. (<u>Id.</u>) She reported that she had auditory hallucinations and was paranoid. (<u>Id.</u>) Her affect was congruent with her self-reported mood. (<u>Id.</u>) "Her intellect was estimated to fall within the borderline average range." (<u>Id.</u>) Her longer-term memory was intact; her short-term memory and concentration "were difficult to assess due to her labile mood and irritability." (<u>Id.</u>) Her insight and judgment were impaired. (<u>Id.</u>) She was diagnosed with bipolar disorder, not otherwise specified, depressed. (<u>Id.</u>) Her current GAF was 40. (<u>Id.</u> at 490.) Dr. Armour assessed her as being moderately impaired in her activities of daily living, moderately to severely impaired in social functioning, and moderately impaired in concentration, persistence, and pace. (<u>Id.</u>)

In August 2009, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Kyle DeVore, Ph.D. (<u>Id.</u> at 499-510.) Plaintiff was assessed as having affective disorders, i.e., bipolar and depression, and substance addiction disorders,

i.e., alcohol and polysubstance dependence, status unknown.  (Id. at 499, 502, 505.)  These disorders resulted in no restrictions in her daily living activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 507.)  There was insufficient evidence from which to determine whether there had been repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. DeVore assessed Plaintiff as not being significantly limited in any of the three abilities in the area of understanding and memory.  (Id. at 511.)  In the area of sustained concentration and persistence, Plaintiff was moderately limited in three of the eight listed abilities, i.e., the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  (Id. at 511-512.)  She was not significantly limited in the remaining five abilities.  (Id. at 511.)  Plaintiff was moderately limited in three of the five abilities in the area of social interaction and was not significantly limited in the other two.  (Id. at 512.)  In the area of adaptation, she was not significantly limited in three of four abilities and moderately limited in one.  (Id.)

In October 2009, Dr. Muhammad completed a Physical Medical Source Statement for Plaintiff.  (Id. at 515-18.)  She was not limited in balancing and did not need to use a cane.  (Id. at 515.)  At one time and without a break, she could sit for approximately six hours and walk or stand for three to five hours.  (Id. at 516.)  Throughout an eight-hour day, she could

sit for the same period, stand for about six hours, and walk for three to five hours. (Id.) She could frequently lift no more than five pounds and occasionally lift no more than twenty-five pounds. (Id.) She could occasionally crawl and climb ladders and scaffolds. (Id.) She could frequently stoop, crouch, and reach above her head. (Id.) She could frequently tolerate exposure to noise, odors or dust, and vibrations, but could only occasionally tolerate exposure to temperature or humidity extremes. (Id. at 517.) She did not have a medically determinable impairment that could be expected to produce pain. (Id.) Her medically determinable impairments included hypertension, high cholesterol, hot flashes due to menopause, bipolar disorder, and back pain. (Id. at 515.) Because of her medical impairments, Plaintiff would have to lie down or take a nap for an hour during a normal eight-hour workday. (Id. at 518.) Because of her back pain, muscle spasm, and nervousness, she would have to take a break more frequently than every hour. (Id.) Her limitations had not, and were not, expected to last twelve continuous months. (Id.)

Dr. Patel wrote on February 19, 2010, that Plaintiff had been under his care for schizophrenia disorder since October 2009. (Id. at 527.) He added that, in his opinion, "she is disabled due to her mental condition." (Id.)

Dr. Espana wrote on February 22, 2010, that Plaintiff had been his patient since October 19, 2009, and was"being treated for multiple medical problems, including Hypertension, Hyperlipidemia, Bipolar disorder, and joint pain." (Id. at 529.)

In April 2010, Dr. Patel completed a Mental Medical Source Statement submitted by Plaintiff's counsel. (Id. at 589-91.) In the area of activities of daily living, he assessed

Plaintiff as being markedly limited in her ability to cope with normal work stress, moderately limited in her ability to function independently, and extremely limited in her ability to behave in an emotionally stable manner. (Id. at 589.) In the area of social functioning, she was markedly limited in her abilities to relate in social situations and to accept instructions and respond to criticism. (Id.) She was moderately limited in her ability to interact with the general public and to maintain socially acceptable behavior. (Id.) In the area of concentration, persistence, or pace, she was markedly limited in her ability to work in coordination with others and was moderately limited in the other six abilities listed. (Id. at 590.) Her impairments would cause unpredictable interruptions during a normal work day or work week, cause her to be unpredictably late to work, and cause her to be absent from work. (Id.) He did not know how frequently this behavior would occur. (Id.) He opined that the limitations he assessed would last, or be expected to last, twelve consecutive months. (Id. at 591.) Plaintiff's diagnosis was schizophrenia. (Id.)

In May 2010, Dr. Espana completed a Physical Medical Source Statement for Plaintiff. (Id. at 859-62.) He listed diagnoses of rheumatoid arthritis, polyarthritis, hypertension, hyperlipidemia, gastroesophageal reflux disease (GERD), bipolar disorder, and depression. (Id. at 859.) She was limited in balancing and should use a cane. (Id.) At one time and without a break, she could sit for approximately two hours and walk or stand for fifteen to thirty minutes. (Id. at 860) In an eight-hour day, she could sit for the same period and could stand or walk for ninety minutes or less. (Id.) She could continuously lift and carry five pounds or less and frequently lift and carry ten pounds. (Id.) She could occasionally stoop,

- 17 -

continuously reach above her head or crawl, but could only rarely crouch or climb. (Id.) She could rarely tolerate exposure to noise and temperature or humidity extremes; could occasionally tolerate exposure to odors or dust; and could frequently tolerate exposure to vibrations. (Id. at 861.) Her pain was constant, and was objectively indicated by muscle spasms, a reduced range of motion, and motor disruption. (Id.) Subjective indications of her pain included her complaints of such and irritability. (Id.) Because of her pain and discomfort, Plaintiff would have to lie down for three hours each day. (Id. at 862.)

In July 2010, Plaintiff was evaluated by Karen Hampton, Ph.D. (Id. at 630-40.) Dr. Hampton noted that Plaintiff's reliability was questionable. (Id. at 630.) Plaintiff reported she drank alcohol approximately once a week – "'two beers'" "'on the weekend'" – and had no problems with drinking and medications interacting. (Id. at 632.) On examination, Plaintiff had poor short-term recall, a "very limited" fund of knowledge, adequate judgment in safety situations and social reasoning; an occasional loose thought process; and trouble associating concrete objects and abstract ideas. (Id. at 633-34.) Her results on the Wechsler Adult Intelligence Scale – 4th Edition indicated she functioned in the borderline range of intellectual functioning. (Id. at 634-35. 639.) Her results on the Wechsler Memory Scale – 3rd edition were within the borderline-impaired range. (Id. at 636, 640.) Her responses on the Comprehensive Trail Making Test indicated she had a cognitive processing speed that was "extremely low for an adult." (Id. at 636-37, 639.) Plaintiff was also given the Minnesota Multiphasic Personality Inventory – 2nd Edition – Restructured Form test. (Id. at 637-38.) Plaintiff's responses "suggested an exaggeration of symptoms and distress that

emphasized somatic health-related complaints above psychiatric symptomology while having both; and overall was concluded as responding in an extremely exaggerated manner, possibly due to motivation for secondary gain, and/or impatience with the testing process that at that point was less directly supervised." (Id. at 637.) Even so, Plaintiff "appear[ed] vulnerable to decompensation under increased stressors." (Id. at 638.) Dr. Hampton diagnosed Plaintiff with schizoaffective disorder, bipolar type; early onset dysthymia; and borderline intellectual functioning. (Id. at 638.) Her current GAF was 45.[4] (Id.) She assessed Plaintiff as being mildly impaired in her activities of daily living; mildly impaired in her ability to understand and recall simple instructions; markedly impaired in her ability to understand and follow through with complex instructions; severely impaired in concentration and persistence; and severely impaired in social functioning. (Id.)

Dr. Hampton also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Plaintiff. (Id. at 641-43.) She assessed Plaintiff as having a mild limitation in her abilities to understand, remember, and carry out simple instructions; a moderate limitation in her ability to make judgments on simple work-related decisions; and marked limitations when those instructions and decisions were complex. (Id. at 641.) She had marked limitations in her abilities to interact appropriately with the public and coworkers and to respond appropriately to usual work situations and to changes in a routine work

---

[4]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

setting.  (Id. at 642.)  She had moderate limitations in her ability to interact appropriately with supervisors.  (Id.)

## Discussion

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).  Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)).  Step one is that the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738.  Step two is that the claimant must have a severe impairment.  See 20 C.F.R. § 416.920(c).  At the third step in the sequential evaluation process, the ALJ must determine whether the claimant

has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994). "Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant

number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

Additionally, "'[a]n individual shall not be considered disabled for purposes of [SSI] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor to the Commissioner's determination that the individual is disabled.'"  **Kluesner v. Astrue**, 607 F.3d 533, 537 (8th Cir. 2010) (quoting 42 U.S.C. § 423(d)(2)(C) and noting that 42 U.S.C. § 1382(c)(a)(3)(J) has a similar provision for Title XVI).  The claimant meets this burden if the ALJ "'is unable to determine whether substance abuse disorders are a contributing factor to the claimant's otherwise-acknowledged disability . . . ."  **Id.** (quoting Brueggerman v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003)).

When determining whether a substance abuse disorder is a contributing factor "[t]he key factor" is whether the claimant would still be found disabled if she stopped using drugs or alcohol.  20 C.F.R. § 416.935(b)(1).  When making this determination, the claimant's current mental and physical limitations are evaluated to assess whether they would remain if the claimant stopped using drugs or alcohol and, if so, whether the remaining limitations would be disabling.  20 C.F.R. § 416.935(b)(2).  "When a claimant is actively abusing [alcohol], this inquiry is necessarily hypothetical, and thus more difficult than if the claimant had stopped."  **Kluesner**, 607 F.3d at 537; accord **Pettit v. Apfel**, 218 F.3d 901, 903 (8th Cir. 2000).  The relevant question is not only if the claimant's substance abuse was in remission at the time of the hearing, but is whether it was active during much of the relevant period.  **Kluesner**, 607 F.3d at 538; **Vester v. Barnhart**, 416 F.3d 886, 890 (8th Cir. 2005).

"[The claimant] carries the burden of proving her substance abuse is not a contributing factor material to the claimed disability." **Estes v. Barnhart**, 275 F.3d 722, 725 (8th Cir. 2002) (citing Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000)); accord **Fastner v. Barnhart**, 324 F.3d 981, 984 (8th Cir. 2003). On the other hand, if "[t]he ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow." **Brueggemann**, 348 F.3d at 693.

In the instant case, the ALJ had the difficult task of determining whether Plaintiff's disabling limitations would remain if she stopped abusing alcohol. Plaintiff continues that there is no evidence that she had not stopped and that the ALJ's conclusion otherwise is impermissibly based only on her past substance abuse.

Both Plaintiff and the Commissioner cite the medical records in support of their respective arguments addressing whether Plaintiff had stopped abusing alcohol as of April 2009. Plaintiff correctly notes that "[n]o treating physician or examining physician who offered an opinion about Plaintiff's limitations has attributed any of her limitations to ongoing alcohol or drug use, or said that Plaintiff has abused drugs or alcohol at any time since her amended alleged disability onset date." (Pl.'s Br. at 23, ECF No. 24.) Also, Dr. Reid had not seen any evidence in the record that Plaintiff was "heavily using alcohol or heavily using illegal drugs" since that date. (R. at 90.) The Commissioner cites the medical records in support of her argument that there is no credible evidence that Plaintiff stopped abusing alcohol – an abuse that is not in question as having existed at some point in time.

Other than Plaintiff's own reports in the medical records of her substance use, there are references to such use that are independent of her credibility. When seeing Plaintiff in July 2009, Dr. Ahmad diagnosed her with alcohol abuse and told her to stop drinking. This diagnosis and instruction was repeated when he next saw her, in September 2009. The February 2010 records of DePaul indicated she had a history of cannabis and cocaine use..

The other references in the record to Plaintiff's drug and alcohol use are her ever-shifting reports of such. She told Dr. Armour that the only drug she had used was marijuana. After Dr. Ahmad diagnosed her with alcohol abuse and told her for the second time to stop drinking, Plaintiff changed doctors and saw Dr. Patel. She told him she did not have a history of alcohol abuse. She also informed him she had stopped using cocaine and marijuana three years earlier. At a therapy session the same month, she reported she had not used drugs or alcohol for ten years. She told Dr. Espana that month she drank one beer a week. In February 2010, she told Dr. Patel and her therapy group she did not drink alcohol. The same month, she told Dr. Espana that she drank beer. In May 2010, Plaintiff testified she had not used drugs since 1996. In June 2010, she told the providers at DePaul that she had not used cocaine and marijuana for the past ten years. When being treated at DePaul in November 2010, she denied the use of alcohol or drugs. When testifying in December 2010, Plaintiff stated she had not used cocaine for five to ten years. She first stated that she had not had a drink for six months, but later stated she had stopped drinking beer in September, three months earlier.

In addition to the foregoing inconsistent reports of alcohol and drug use and cessation, when asked about a reference in Dr. Armour's report to a statement by Plaintiff that she had a problem with lying, Plaintiff testified, under oath, that she had never seen him and suggested he was lying.

As noted above, Plaintiff has the burden of proving that alcohol abuse "is not a contributing factor material to [her] claimed disability." **Estes**, 275 F.3d at 725. The cited medical records do not carry this burden given the incorporation in those records of Plaintiff's reports of her drinking, reports which the ALJ found to be not credible. This finding is supported by substantial evidence on the record as a whole. See **Baker v. Colvin**, 2013 WL 5770600, *6 (E.D. Mo. Oct. 24, 2013) (affirming ALJ's decision that claimant would not be disabled but for substance abuse; claimant's testimony that he had long periods of sobriety was found by ALJ not to be credible); **Shaw v. Astrue**, 2010 WL 493832, *6 (W.D. Ark. Feb.5, 2010) ("Notwithstanding the Plaintiff repeated protest throughout her records that she is not an alcoholic the record is clear she abuses alcohol on a regular basis and had done so for many years. Untying the Gordian Knot of Alcoholism and Mental Impairments is compounded when, as here, the alcoholic abuse continues through the evaluation period.").

Plaintiff further argues that the ALJ failed to properly evaluate the opinions of Drs. Muhammad, Patel, and Espana. Addressing Dr. Muhammad's medical source statement, see pages 15 to 16, supra, the ALJ noted the inconsistency between finding that Plaintiff was restricted by back pain and also that she did not have a medically determinable impairment that could be expected to result in back pain. (R. at 120.) Addressing Dr. Espana's medical

- 25 -

source statement, see pages 17 to 18, supra, the ALJ noted that Dr. Espana listed rheumatoid arthritis as an impairment of Plaintiff's, but there were no supporting medical findings or laboratory data to support such diagnosis.[5]  (Id.)  The ALJ concluded that Dr. Espana's assessment was primarily based on Plaintiff's complaints of pain.  (Id.)  Addressing Dr. Patel's medical source statement, see pages 16 to 17, supra, the ALJ noted that he had not provided an assessment of Plaintiff's mental residual functional capacity if she stopped using alcohol and followed the prescribed medication regimen.  (Id. at 121.)

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009).  "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)).

---

[5]Indeed, as noted by the ALJ, Dr. Faber reported that Plaintiff tested negative for rheumatoid arthritis.  (R. at 671.)

An evaluation of the record as a whole supports the ALJ's assessments of the medical source statements completed by Drs. Muhammad, Espana, and Patel. Dr. Muhammad saw Plaintiff twice: once in July 2009 and once in October 2009, the same day on which he completed the medical source statement. At the October visit, he noted that there were no complaints of low back pain. The same day he opined that she would need to take frequent breaks because of back pain, yet she could stand at one time for three to five hours and could frequently stoop. He also opined that her impairments were not expected to last twelve months. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson**, 578 F.3d at 843; accord **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009); **House v. Astrue**, 500 F.3d 741, 744 (8th Cir. 2007), or is based on the claimant's subjective complaints, see **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ properly gave treating physician's opinion non-controlling weight when, among other things, that opinion was largely based on claimant's subjective complaints); **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (holding ALJ did not err in discrediting mental RFC assessment of neurologist that was based, "at least in part, on [claimant's] self-reported symptoms" which had been "found to be less than credible"); **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence).

Dr. Espana's opinion, clearly based on Plaintiff's subjective complaints, was also properly discounted. Although he cited a reduced range of motion as an objective indication of her pain, she consistently had a full range of motion on examinations. And, he cited her subjective complaints of pain as a basis for such severe restrictions as being able to walk or stand continuously for no longer than thirty minutes. He opined she needed to use a cane; however, there is nothing in the record to suggest she ever did so.

The ALJ found that Plaintiff was disabled when her substance abuse was considered. Dr. Patel's medical source statement describes disabling limitations. As noted by the ALJ, however, he does not distinguish between those limitations as they are when Plaintiff is abusing alcohol – which the ALJ determined she was – and when she was not. This failure was properly considered by the ALJ.

### Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  24th  day of March, 2014.